**In re HEATH GLOBAL, INC., Debtor.**

**Heath Global, Inc., Appellant,**

v.

**Jim Magner, Appellee.**

**No. 12 Civ. 8966 (RA).**

United States District Court, S.D. New York.

May 31, 2013.

---

Eduardo Jorge Glas, McCarter & English, LLP, New York, NY, for Appellee.

James B. Glucksman, Delbello, Donnellan, Weingarten, Wise & Wiederkehr, LLP, White Plains, NY, for Debtor Appellant.

## OPINION AND ORDER

RONNIE ABRAMS, District Judge.

This case concerns the rights to the "Invest.com" domain name. The questions before the Court are (1) whether an agreement to sell that domain name was terminated before the buyer filed for bankruptcy protection and, if not, (2) whether the buyer has retained any rights under that agreement. The Bankruptcy Court answered both questions in the negative.

This Court agrees with the Bankruptcy Court's conclusion that the agreement was not terminated pre-petition. It respectfully disagrees, however, with the Bankruptcy Court's conclusion that the buyer no longer has rights under the agreement. Accordingly, the judgment of the Bankruptcy Court is vacated and this case is remanded for further proceedings consistent with this opinion.

---

1. The following facts are taken from the parties' briefs and the record on appeal.

2. Although not relevant to this dispute, section 5 of the Sale Agreement permitted Debt-

## BACKGROUND[1]

### The Sale Agreement

In March 2011, Heath Global, Inc. (the "Debtor") and Jim Magner entered into a Sale Agreement pursuant to which Magner agreed to sell to Debtor the "Invest.com" domain name. (D–13 at 26–34.) Section 4 of the Sale Agreement set forth the parties' agreed-upon payment schedule as follows:

4. Consideration. As consideration for purchase of the Domain Name, Buyer will be obligated to deliver or cause to be delivered to Seller: (a) a $25,000 payment on assignment of Domain Name to [the designated escrow agent]; (b) a $225,000 payment on or before October 1, 2011; (c) a $750,000 payment on or before February 1, 2012; and (d) a $1,000,000 payment on or before February 1, 2013.

(*Id.* 27.) The parties therefore agreed that Debtor would pay a total price of $2,000,000 over a two-year period in exchange for the domain name.

In the event Debtor failed to make timely payments under section 4, section 6(b) of the Sale Agreement afforded Magner a "Seller Special Remedy," providing that:

Notwithstanding anything in this Sale Agreement or any remedy available to Seller by law, in the event Buyer fails to make a payment due to the Seller under Section 4, subject to the provisions of Section 5,[2] Seller's remedy for any such breach shall be entitled to [sic], upon 7 days written notice to [the designated escrow agent] and to the Buyer, in accordance with the provisions of the Es-

---

or to make the payments required by sections 4(c) and (d) subsequent to the due dates listed in those subsections, subject to certain conditions. (D–13 at 27–28.)

crow Agreement, (i) immediately terminate this Agreement on written notice to the Buyer, (ii) the return of the Domain Name and revocation of any licenses, assignments, rights or authorisations granted herein or in the Escrow Agreement, and (iii) to retain any amounts already paid to the Seller by the Buyer pursuant to this Agreemenet [sic] and the Escrow Agreement[.]

(*Id.* 29) (underlining in original).

Section 8(r) also addresses Magner's right to terminate in the event of Debtor's failure to make timely payments under section 4. That provision states, in full:

This Sale Agreement shall terminate upon the completion of payments as set forth in Section 4 above. This Sale Agreement may be terminated early (i) immediately by Seller via written notice upon Buyer's failure to make a payment as set forth in Section 4 above, subject to Section 5 above.

(*Id.* 33) (underlining in original).

### The Escrow Agreement

Also in March 2011, the parties executed the Escrow Agreement referred to in section 6(b) of the Sale Agreement. (*Id.* 38–42; Appellant's Opening Br. 5.) Pursuant to the Escrow Agreement, Magner assigned the domain name to the designated escrow agent, which was also charged with receiving Debtor's payments and disbursing them to Magner. (D–13 at 38–39.) Section 5 of the Escrow Agreement states:

5. *Delivery of Escrow Items by Escrow Agent.* Escrow Agent agrees to deliver the Escrow Items as follows:

a. *To Purchaser.* At the time Purchaser has made all payments due under the Payment Schedule, the Escrow Agent shall deliver the Escrow Items to Purchaser within five (5) business days.

b. *To Seller.* If Purchaser fails to make a payment due under the Payment Schedule, Seller may declare a default by sending Purchaser a notice of default. Such notice of default shall also be sent in writing to the Escrow Agent. If the Purchaser fails to cure the default within five (5) business days following such notice, Seller shall have the right to notify the Escrow Agent (with a copy to Purchaser) of such failure and demand delivery of the Escrow Items. Escrow Agent shall deliver the Escrow Items to Seller within five (5) business days after receiving such written demand.

(*Id.* 40.)

Sections 6(b) and 8(r) of the Sale Agreement, as well as section 5(b) of the Escrow Agreement, therefore each address Magner's right to terminate the parties' transaction in the event of Debtor's default, and each describe a method by which he could do so.

### Pre–Petition Events

Debtor timely paid the first installment under section 4(a) of the Sale Agreement, due upon Magner's assignment of the domain name to the escrow agent. (D–9 ¶ 10.) As the October 1, 2011 due date for the second installment approached, however, Debtor advised that it would have to withdraw from the sale unless Magner permitted it to make a lower payment than the $225,000 contemplated in section 4(b). (*Id.* ¶ 11; D–12 at 26, ¶ 5.) Magner agreed, subject to a charge of interest on the balance of the second installment, which Debtor would be required to pay on February 1, 2012 in addition to the $750,000 third installment due on that date pursuant to section 4(c). (D–12 at 47–48.)

Debtor failed to bring its payments current on February 1, 2012, and failed to pay the third installment as well. (*Id.* 26, ¶ 7.) The next day, Magner's counsel sent a letter ("February 2 Letter") to Debtor,

copying the escrow agent, the body of which states in full:

> We refer to the Domain Sale Agreement (the "Agreement") between yourselves and our client dated circa May 2011 [sic].
>
> With reference to Section 4 of the Agreement titled *"Consideration"*, we are instructed that you have, in breach of the Agreement, failed to make payment on 1st February 2012 of the amount due pursuant to Section 4C of the Agreement.
>
> In accordance with Section 6B of the Agreement you are hereby on notice that you are in breach of Section 4 and that our client has instructed us to invoke the *"The Seller Special Remedy"* as defined in the Agreement.
>
> Accordingly, we have been fully authorised and instructed to hereby notify you that our client is:
>
> 1. Immediately terminating the Agreement;
> 2. Seeking the return of the domain name and revocation of any license, assignment, rights or authorisations granted herein or in the Escrow Agreement[;]
> 3. Retaining amounts already paid by you to them pursuant to the Agreement.

(*Id.* 53–54) (emphasis in original). Later that day, the escrow agent emailed Debtor, copying Magner, stating:

> [The escrow agent] has not received payments due under th[e] contract for Invest.com. The seller has notified us of this default. Your first of five business days to complete payment has started. If payment is not received by end of business day on Wednesday, [February] 8, 2012, [the escrow agent] will be returning the domain to the seller.

(*Id.* 56.)

### Bankruptcy Court Proceedings

Debtor filed a Chapter 11 petition on February 8, 2012 at 8:26 p.m. (D–19 at 8–9.) On May 22, 2012, Magner commenced an adversary proceeding against Debtor seeking a judgment from the Bankruptcy Court declaring, *inter alia*, that "the Sale Agreement has now been terminated and the Debtor has no further rights under it." (*D–9* at 6.) Debtor moved to dismiss the complaint and Magner cross-moved for summary judgment on June 20, 2012 and July 17, 2012, respectively. (D–11; D–12.) Following oral argument, the Bankruptcy Court issued an October 23, 2012 bench ruling denying Debtor's motion to dismiss and granting Magner's motion for summary judgment. (D–19.)

In its ruling, the Bankruptcy Court framed the issues as follows: "The two narrow issues before the Court are if and when the sale agreement was terminated, and whether the Debtor has any remaining rights under the sale agreement." (*Id.* 9.)

As to the first issue, the Bankruptcy Court noted that:

> the sale agreement and the escrow agreement are, at best, inartfully drafted and contain inconsistent provisions regarding notice and termination. The most significant inconsistencies at issue in this action can be found in sections 6(b) and 8(r) of the sale agreement, and section 5(b) of the escrow agreement ... [I]t is unclear whether termination may be effected immediately upon written notice by the seller, or whether a cure period is required, and, if so, whether the period is five business days or seven calendar days.

(*Id.* 4–6.) The Bankruptcy Court then proceeded to "reject[ ] [Magner's] argument that termination was effected immediately via Magner's February 2, 2012, notice." (*Id.* 12.) It explained:

> Magner contends that pursuant to section 8(r) of the sale agreement, termi-

nation is immediate upon written notice to the Debtor. While section 8(r) of the sale agreement does, indeed, provide for immediate termination ... [the February 2 Letter] invokes section 6(b) of the sale agreement, the seller's special remedy, which provides for a seven day notice period prior to "immediate" termination upon written notice.... Magner's notice specifically invoked section 6(b) of the sale agreement, not section 8(r). If his intent was to terminate immediately, it was incumbent upon Magner to invoke section 8(r) of the sale agreement[.] ...

(*Id.* 11–12.)

The Bankruptcy Court further held that, under any reading of the agreements, the Chapter 11 petition was filed before the expiration of the cure period. It reasoned:

If the Court agrees with the Debtor that the cure period did not begin to run until February 3, 2012, the [cure] period then ended on February 9, 2012 [i.e., a day after Debtor filed its petition]. However, even if the Court agrees with Magner's assertion that any cure period must run from February 2, 2012, the date the notice was sent, it would be inequitable to then end the final day of the cure period at some unspecified close of business time rather than 11:59 p.m. and not give the Debtor the benefit of the full five or seven days [under Escrow Agreement section 5(b) or Sale Agreement section 6(b), respectively]. Accordingly, the Court finds that because the Chapter 11 Petition was filed before 11:59 p.m. on February 8, 2012, it was filed during either cure period[.]

(*Id.* 14.) Therefore, the Bankruptcy Court concluded, "the sale agreement was not terminated pre-Petition." (*Id.*)

Turning to the second issue—whether Debtor had any remaining rights under the Sale Agreement—the Bankruptcy Court looked to the "nature of the transaction contemplated by the sale agreement, and accordingly, which provisions of the Bankruptcy Code govern the sale agreement and the Debtor's rights thereunder." (*Id.*)

The Bankruptcy Court first rejected Debtor's argument that the Sale Agreement constituted "a secured transaction, and that, therefore, Section 1129 of the Bankruptcy Code is applicable regarding how and when Magner, as a secured creditor, can be paid." (*Id.* 15.) Noting that "[i]t is axiomatic that a debtor cannot provide a security interest in something it does not own," the Bankruptcy Court found there to be "absolutely no language in the sale agreement or escrow agreement granting the Debtor title to the domain name, or granting Magner a security interest in the installment payments or the domain name, nor could there be." (*Id.* 16.)

The Bankruptcy Court next looked to 11 U.S.C. § 108(b), which, as it summarized, provides "that where an agreement fixes a time period in which the Debtor may cure default, the Debtor may cure before the later of the expiration of the time period, or 60 days after the filing of the Petition." (*Id.* 18.) The Bankruptcy Court then adopted Magner's characterization of the Sale Agreement as an option contract, explaining:

Although denominated as a sale agreement, the terms of the agreement describe an option, a transaction in which the optionee agrees to pay consideration for the excusive privilege of purchasing property within a specified time without imposing a binding obligation on the purchaser.... Here, the Debtor paid consideration for the exclusive privilege of purchasing the domain name within a specified period of time. The Debtor was under no obligation to complete the

transaction, and the agreement provides that if the transaction did not close, the seller was entitled to keep the payments made.

(*Id.* 19–20.) Because the sixty-day post-petition period afforded by section 108(b) had expired, the Bankruptcy Court found that the Sale Agreement had terminated "by its terms" and that Debtor no longer had "interest in or rights to the domain name." (*Id.* 25.)

## STANDARD OF REVIEW

■ District courts are vested with appellate jurisdiction over bankruptcy court rulings pursuant to 28 U.S.C. § 158(a)(1). "Congress intended to allow for immediate appeal in bankruptcy cases of orders that finally dispose of discrete disputes within the larger case." *In re Fugazy Exp., Inc.,* 982 F.2d 769, 775 (2d Cir.1992) (internal punctuation and emphasis omitted). A district court reviews a bankruptcy court's legal conclusions de novo and its factual findings for clear error. *In re Bennett Funding Grp.,* 146 F.3d 136, 138 (2d Cir. 1998).

## DISCUSSION

The Court has reviewed, de novo, the Bankruptcy Court's conclusions that: (1) the Sale Agreement was not terminated pre-petition, and (2) Debtor has not retained any rights under the Sale Agreement. The Court addresses each of these conclusions in turn.

### 1. The Sale Agreement was Not Terminated Pre–Petition

■ The Court agrees with the Bankruptcy Court that the Sale Agreement was not terminated pre-petition.

The focus of the parties' dispute on this issue is whether the notice provided in the February 2 Letter alone was sufficient to terminate Debtor's rights under the Sale Agreement. In the February 2 Letter, Magner expressly invoked the "Seller Special Remedy" described in section 6(b) of the Sale Agreement. By the plain terms of section 6(b), Magner was required to perform two acts to effect the "Seller Special Remedy." He was first required to provide written notice to Debtor and the escrow agent of Debtor's failure to comply with section 4's payment provisions. Once that notice was provided, only following the passing of seven days could Magner "immediately terminate th[e] Agreement on written notice to the Buyer."

The February 2 Letter adequately notified Debtor of Magner's invocation of the "Seller Special Remedy." However, to effect termination, the express terms of section 6(b) required Magner to supply a second written notice following the passage of seven days. Magner was unable to issue the second notice because Debtor filed its Chapter 11 petition prior to the expiration of that seven-day period. Therefore, the Sale Agreement was not, and could not have been, terminated pre-petition.

Magner argues that Debtor's rights to the domain name were extinguished pre-petition by virtue of section 8(r) of the Sale Agreement. Magner contends that the February 2 Letter, "implicitly incorporates" section 8(r) by stating that the Sale Agreement is "being immediately terminated." (Opp'n 22–23 n.12.) But section 6(b), too, speaks of immediate termination, as well as the other remedies—return of the domain name and retention of prior payments—to which the February 2 Letter claims Magner is entitled. The February 2 Letter therefore simply attempts to track the language of 6(b), which explains its reference to immediate termination. Magner's prior counsel apparently simply overlooked section 6(b)'s seven-day notice requirement. They also apparently over-

looked section 8(r) as well: not only is that section nowhere referenced in the February 2 Letter, but it was not even referenced in Magner's complaint commencing the adversary proceeding. *See* D–9 at 4 (referring to section 6(b) as the "relevant part" of the Sale Agreement on the issue of termination). Magner's belated invocation of section 8(r) is thus a post hoc attempt to rewrite the February 2 Letter. The Court rejects that attempt.

### 2. Debtor Has Retained Rights Under the Sale Agreement

#### a. *The Sale Agreement is Not an Option Contract*

In its bench ruling, the Bankruptcy Court defined an option agreement as "a transaction in which the optionee agrees to pay consideration for the exclusive privilege of purchasing property within a specified time without imposing a binding obligation on the purchaser." (D–19 at 19.) It found that the terms of the Sale Agreement described such an arrangement because "the Debtor paid consideration for the exclusive privilege of purchasing the domain name within a specified period of time," "[t]he Debtor was under no obligation to complete the transaction, and . . . that if the transaction did not close, the seller was entitled to keep the payments made." (*Id.* 20.)

The Court takes no issue with the Bankruptcy Court's definition of an option agreement, which is clearly established and uncontroversial under the law. *See* Restatement (Second) of Contracts § 25 (1981) ("An option contract is a promise which meets the requirements for the formation of a contract and limits the promisor's power to revoke an offer."); *Lewes Inv. Co. v. Estate of Graves*, Civ. A. No.

2893–VCG, 2013 WL 508486, at *1 (Del.Ch. Feb. 12, 2013) (An option contract "permit[s] the buyer to walk away from the transaction."); *Julian v. Julian*, No. 1892–VCP, 2010 WL 1068192, at *8 (Del.Ch. Mar. 22, 2010) ("[A]n option contract to purchase . . . merely grants its holder the *right* to purchase property under the conditions established in that contract, which right the holder may or may not exercise.") (emphasis in original); *Equitable Trust Co. v. Delaware Trust Co.*, 54 A.2d 733, 736 ·(Del.Ch.1947) ("The grant of an option to purchase is neither a sale nor an agreement to sell property.").[3]

 The Court respectfully disagrees, however, with the Bankruptcy Court that the express language of the Sale Agreement evinces the parties' intent to enter into an option contract. *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del.2009) ("In analyzing disputes over the language of a contract, we give priority to the intention of the parties. We start by looking to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language."). Contrary to the Bankruptcy Court's finding, the express language of the Section 4 of the Sale Agreement—as it is titled—*does* impose a binding obligation on Debtor. Section 4 provides that Debtor is "*obligated* to deliver or cause to be delivered to the Seller" the payments set forth in the schedule "[a]s consideration for purchase of the Domain Name." That language indicates that Debtor promised to pay the consideration set forth in Section 4 in exchange for Magner's promise to sell the domain name.

That the parties intended the Sale Agreement to bind both Magner and Debt-

---

**3.** Section 8(g) of the Sale Agreement provides: "This Sale Agreement and the terms, covenants and conditions hereof shall be con-

strued in accordance with, and governed by, the laws of Delaware . . ." (D–13 at 31.)

or is reinforced by the language of section 6(b). As Debtor's counsel explained at oral argument before this Court:

> [P]aragraph 6B starts out, ["]Notwithstanding anything in this sale agreement, or any remedy available to seller by law.["] And the way I construe that is that . . . Magner would have been able to bring an action for money damages under the sale agreement, or to enforce other remedies. The use of the seller's special remedy, or the preliminary notice prior to the seller's special remedy was an option that Jim Magner had. It was not the only way of enforcing the sale agreement . . . there were other remedies.

(Oral Arg. Tr. 9.) The Court agrees that the language of section 6(b) indicates not only an objective understanding that Magner would be entitled to "retain any amounts already paid" in the event of Debtor's default, but that his exercise of this "Special Remedy" would not prejudice his right to seek "any remedy available to [him] by law," presumably including expectation damages flowing from Debtor's breach. *See Pringle v. Taylor,* 12A–04–002 (RBY), 2012 WL 6845692, at *4 (Del.Super. Dec. 20, 2012) ("The standard remedy for breach of contract is expectation damages, meaning the amount of money that would put the promisee in the same position as if the promisor has performed the contract."); *Martin v. Toll,* 196 Iowa 388, 192 N.W. 806, 807 (1923) ("The contract, therefore, was not a mere option. The forfeiture provision was not inconsistent with such express promise. It was simply a special remedy provided for the benefit of the vendors. They were not bound to pursue such remedy. They had a

right to elect the remedy of . . . damages."). The parties' use of the word "Special" to describe the remedy available through section 6(b) presupposes the availability of a distinct and more customary remedy through a civil action for damages.[4]

Accordingly, contrary to Magner's counsel's assertion at oral argument that Debtor could "walk away from this contract at any time," (Oral Arg. Tr. 24), the Sale Agreement's express language indicates that Debtor was "obligated" to comply with section 4's terms.

### b. *Termination Required a Post–Petition Act*

▇ The Bankruptcy Court's finding that the Sale Agreement is an option contract led it to conclude that the Sale Agreement "terminated by its terms when the Debtor did not make the payments owed before the expiration of the cure period." (D–19 at 23.) This Court's conclusion that the Sale Agreement is *not* an option contract leads it to conclude that the Sale Agreement has not terminated post-petition.

As discussed above, the parties contemplated that termination by way of section 6(b) could be accomplished only if and when Magner supplied written notice of termination "upon 7 days written notice." The second notice required under section 6(b) was therefore a condition subsequent—i.e., "[a] condition that, if it occurs, will bring something else to an end" or "an event the existence of which, by agreement of the parties, discharges a duty of performance that has arisen." Black's Law Dictionary (9th ed. 2009).

---

**4.** The language of the Escrow Agreement also evinces an intent that the Sale Agreement bind Debtor. It recites that the "Seller is selling and Purchaser is purchasing" the do- main name and that the Escrow Agreement was established to secure Magner's "rights to payments." (D–13 at 38.)

The nature of conditions subsequent was explained in detail by Judge McMahon in *In re St. Casimir Dev. Corp.*, 358 B.R. 24 (S.D.N.Y.2007), a case that presented circumstances not dissimilar to those presented here. The issue in *St. Casimir* was whether a limited partner properly effectuated removal of the debtor from a limited partnership under the "Special Removal Rights" provision of the operative partnership agreement. *Id.* at 27–29. That provision, like section 6(b) here, contemplated a multi-step process to effectuate removal. *Id.* at 29. Judge McMahon defined a condition subsequent as follows:

> [W]here a party has the option either to terminate the contract upon the occurrence of an event or not to terminate— and where the contract does not expire by its own limitation upon such occurrence—then the contract contains a condition subsequent. Under a condition subsequent, termination of the contract is not "self-executing" when some triggering even[t] occurs; rather the person who wishes to terminate the contract must perform some additional act in order to terminate the contract.

*Id.* at 39. Parsing the relevant contractual language, Judge McMahon determined that "the Partnership Agreement's removal scheme work[ed] as a condition subsequent." *Id.* at 38. She therefore "conclude[d] that [the limited partner] was required to send an additional notice to the Debtor after the ten day notice of removal period expired in order to effect the Debtor's removal." *Id.* She explained:

> The wording could not be clearer: after [the limited partner] serves a ten day notice of intent to remove on the Debtor—and ten days pass—[the limited partner] has the right to remove the General Partner but does not have to exercise that right. Thus, under the scheme contemplated by the Partnership Agreement, [the limited partner] must serve a ten day notice of intent to remove, wait for the ten days to pass, and then exercise its right (which it has no obligation to exercise) to remove the Debtor from its position, in order to effect the removal. The scheme devised by the parties is a classic example of a condition subsequent.

*Id.* at 38–39. The scheme contemplated by section 6(b) of the Sale Agreement required Magner to provide notice and wait at least seven days. The Sale Agreement did not automatically terminate at that point. Rather, termination would be effectuated only when Magner sent a second written termination notice (which he was "entitled," but not obligated, to do).[5]

In *St. Casimir*, Judge McMahon concluded that the debtor was not served with a valid removal letter prior to the debtor's Chapter 11 filing and that "the automatic stay ... prevent[ed] [the limited partner]

---

5. It is for this reason that *Counties Contracting and Constr. Co. v. Constitution Life Ins. Co.*, 855 F.2d 1054 (3d Cir.1988), to which Magner directed the Court in his brief and at oral argument, is factually distinguishable. In that case, a life insurance policyholder filed a bankruptcy petition after the due date for the annual premium but before the expiration of the applicable grace period for payment included in the policy. *Id.* at 1056. The district court reached the conclusion Magner would have the Court reach here: that "filing the voluntary bankruptcy petition during the statutory grace period extended the grace period for 60 days under 11 U.S.C. § 108(b)" but that "[a]fter this period, the policy expired." *Id.* That conclusion was premised, however, on the district court's rejection of debtor's argument that the life insurance company "was required to take affirmative action to cancel the policy." *Id.* The Third Circuit affirmed, also concluding that the policy's language did "not compel affirmative cancellation activity requiring written notice." *Id.* at 1061–62.

from terminating the [d]ebtor as a [g]eneral [p]artner today." *Id.* at 41. The same result obtains here. The automatic stay triggered by Debtor's February 8, 2012 Chapter 11 filing precluded—and still today precludes—Magner from providing the requisite second written notice. Therefore, the Sale Agreement, and Debtor's rights thereunder, have not been terminated post-petition.

### CONCLUSION

Based on the foregoing, the Court finds that the Sale Agreement was not terminated pre- or post-petition. Accordingly, the Bankruptcy Court's decision denying Debtor's motion to dismiss and granting Magner's motion for summary judgment is vacated and this case is remanded for further proceedings consistent with this opinion. The Clerk of Court is respectfully directed to terminate this appeal.

SO ORDERED.